1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   STEVEN K. CASTELLO,                          CASE NO. C10-1457 MJP

11                    Plaintiff,                   ORDER ON DEFENDANTS'
                                                   MOTION FOR SUMMARY
12        v.                                       JUDGMENT

13   CITY OF SEATTLE,

14                    Defendant.

15

16        The Court, having received and reviewed:

17        1.  Defendants' Motion for Summary Judgment (Dkt. No. 96)

18        2.  Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 108)

19        3.  Defendants' Reply in Support of Motion for Summary Judgment (Dkt. No. 113)

20   and all attached declarations and exhibits, makes the following ruling:

21        IT IS ORDERED that the motion is GRANTED; dismissal of this matter will be withheld

22   pending clarification of the status of Plaintiff's Ninth Claim for Relief.

23

24

**Background**

Plaintiff is a firefighter/paramedic with the Defendant Seattle Fire Department (SFD). Defendant Duggins is a Deputy Chief of SFD and the commander of B3, Plaintiff's battalion; Defendant Dean is the Chief of SFD.  The firefighters and paramedics are members of Local 27 of the International Association of Firefighters.

Beginning in late 2008, Plaintiff became the recipient of a number of disciplinary actions. In November 2008, Plaintiff mailed a survey ("Save Medic One," or "SM1") to the homes of all the paramedics. Dean Decl., Ex. D.  The questionnaire covered issues of morale, management, job satisfaction, policy and procedure within the SFD.  Co-workers complained directly to the Chief (Defendant Dean) about the survey and the mailing.  Dean expressed his concerns to Plaintiff at a November 10, 2009 meeting.  Accoridng to Dean, he told Plaintiff during the course of that meeting to cease soliciting paramedics to participate in the survey (Dean Decl., ¶ 5). When Dean learned that Plaintiff was continuing to solicit participation in the survey, he decided to temporarily transfer Plaintiff out of B3.  Dean Decl., ¶ 6; Ex. G.  Plaintiff was sent a letter on November 25, 2009 informing him of the decision and the reasons for it. Id., Ex. F.  Dean believed that Plaintiff's behavior threatened the harmonious functioning of the paramedic unit and its ability to respond to medical emergencies.  The transfer was temporary, pending investigation of the co-worker's complaint and a return to normalcy in the paramedic unit.  Dean Decl., ¶ 6.

Travis Taylor, an SFD EEO Officer, was brought in by Dean to investigate a co-worker's complaint that the SM1 survey constituted harassment and retaliation for her prior complaints against Plaintiff.  At the conclusion of his investigation, Taylor issued two reports: one concluded that the co-worker's complaint had no merit (Id., Ex. H), the second concluded that Plaintiff's conduct concerning the survey following the Dean meeting constituted

1   insubordination, and that the survey had disrupted the B3 battalion.  Id., Ex. J.[1]  After meeting

2   with Plaintiff and providing him a copy of the report, Dean decided not to discipline Plaintiff.

3   Dean Decl., ¶ 10, Ex. L.

4          In December 2008, Plaintiff filed a complaint against Duggins, Dean and Taylor.  These

5   allegations were found to be without merit.  Id., Ex. N, pp. 18-30.

6          In June 2009, Plaintiff conducted searches of Medic One vehicles to determine whether

7   there was compliance with a new policy on securing controlled substances.  While he did find

8   some violations of the policy (which resulted in counseling for the Medical Support Officers

9   [MSOs] involved), the clandestine, unauthorized nature of the searches and his failure to disclose

10  the violations immediately were troublesome to both the MSOs and to Dean.  Dean Decl., ¶ 8.

11         That same month, Plaintiff received formal counseling for two minor violations.  Duggins

12  Decl., Exs. N-O.  But on June 13, 2009, a more severe infraction occurred, in which Plaintiff was

13  found to have been insubordinate to his supervising officer (Lt. Barokas) during an emergency

14  response.  For this violation, Dean issued Plaintiff a reprimand.  Id., Ex. P.

15         As a result of the aggregation of these incidents, Dean concluded that "plaintiff's

16  behavior raised serious questions about his ability to work with his superior officers, and whether

17  he posed a threat to other employees."  Dean Decl., ¶ 12.  Dean decided to place Plaintiff on paid

18  administrative leave.  Duggins, Deputy Chief Lomax and Lt. Barokas attempted to meet with

19  Plaintiff on June 16 regarding the decision.  When Lt. Barokas informed him that he was being

20  placed on leave, "plaintiff became irate and abusive," jumping to his feet and cursing at the

21  officers.  Duggins Decl., ¶ 12, Ex. S.  The following day, Plaintiff appeared twice at Medic One

22

23

24         [1]  Taylor found that Dean "clearly communicated" the order to desist at the November 10 meeting.  Id., Ex. J., p. 1.

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 3

1   headquarters despite being banned from the building.[2]  He again confronted Duggins, and later

2   Barokas and another officer, becoming threatening and abusive on both occasions.  Dean Decl.,

3   Ex. O, pp. 8-9.  Duggins filed a second set of charges and prepared a workplace violence report.

4   Dean Decl., ¶ 14, Exs. V-W.

5          As a result of these incidents, Plaintiff was removed from the paramedic program for a

6   year (although he continued to serve as a firefighter and was permitted to retain his higher

7   paramedic salary) and received an official reprimand.  His appeal of this discipline to the Public

8   Safety Civil Service Commission (PSCSC) was denied – the PSCSC found that SFD had just

9   cause for their actions and concluded that Plaintiff's behavior was "unacceptable, totally

10  inappropriate, insubordinate and warranted severe action."  Dean Decl., Ex. O, ¶¶ 65, 68.  The

11  panel also rejected Plaintiff's allegation that he was subject to disparate treatment because a co-

12  worker had not been disciplined for what Plaintiff claimed was similar conduct.  Id., ¶ 36.

13         Restrictions were placed on Plaintiff during his one-year suspension from paramedic

14  duties.  Initially, Assistant Chief Hepburn issued a memo banning him from the Medic One

15  offices and from attending paramedic continuing education classes.  Id., Ex. U.  That memo was

16  later rescinded by Duggins and a revised memo permitting Plaintiff to attend continuing

17  education classes and enter the Medic One administrative offices was issued.  Id.,  Ex. V.

18  Plaintiff had been barred from practicing as a paramedic in any jurisdiction, and that restriction

19  remained in place (SFD had an agreement with the City of Bainbridge Island to provide SFD

20  paramedics to that municipality, and the restriction prohibited Plaintiff from performing as a

21  paramedic under that contract as well).  Dean Decl., ¶ 17.

22

23  ─────────────

24         [2]  It was determined that, in the course of the initial contact between Plaintiff and his superior officers,
    Plaintiff's outburst prevented them from informing him of the ban.  Dean Decl., Ex. O, p. 7.

1    Prior to the rescission of the Hepburn memo, Duggins (concerned that the SFD

2  paramedics understood that Plaintiff – even though he was still working as a firefighter -- was

3  temporarily disqualified from performing as a paramedic), read and distributed the original

4  memo to a gathering of paramedics.  Duggins later came to believe this was a mistake "because

5  [the memo] arguably contained personal information about Plaintiff that did not need to be

6  provided to paramedics."  He owned up to the mistake at a later meeting and apologized to

7  Plaintiff.  Duggins Decl., ¶ 14; Ex. AA.[3]

8    In August 2010, Plaintiff returned to the paramedic program.  Dean Decl., ¶ 19.

9

10 **Discussion/Analysis**

11 Claim preclusion (collateral estoppel)

12    Defendants argue that Plaintiff is collaterally estopped from challenging any of the

13 findings of the PSCSC pursuant to his appeal of SFD's disciplinary actions.  These findings

14 include that he was "inappropriate" with Lt. Barokas, that he was placed on administrative leave

15 pending a fit-for-duty examination, that his June 16-17 behavior was "extremely agitated and

16 aggressive," that his conduct "was detrimental to SFD morale and order," that his claim that he

17 was disciplined in retaliation for reporting the MSO's violations of the controlled substances

18 policy was unfounded, that his claim that he was being disciplined in a disparate fashion from

19 female co-workers was unfounded and that his one-year removal from the paramedic program

20 was issued in good faith for cause.  Dean Decl., Ex. O.

21 _____

22    [3]  Plaintiff's "Counterstatement of Facts" contains allegations that other paramedics who have been
   transferred out of B3 have not been the subject of public paramedic meetings and further that neither the *revised*

23 terms of Plaintiff's discipline, nor his return to B3 following the suspension, were never made public.  The Court
   notes that these allegations are made without citation to any sworn declaration on personal knowledge and appear to

24 be simply inserted without citation into Plaintiff's briefing.

1    The Court is satisfied that unreviewed (Plaintiff did not appeal the PSCSC determination)

2    rulings by an administrative agency are generally entitled to preclusive effect in later litigation.

3    When an administrative agency is acting in a judicial capacity and resolved disputed
     issues of fact properly before it which the parties have had an adequate opportunity to
4    litigate, the courts have not hesitated to apply res judicata to enforce repose.

5    United States v. Utah Constr'n & Mining Co., 384 U.S. 394, 422 (1966); *see also* Plaine v.

6    McCabe, 707 F.2d 713, 719, fn. 12 (9th Cir. 1986)(if judicial review is available, foregoing the

7    right to appeal an administrative decision does not prevent its preclusive effect).

8        Nowhere in his briefing or complaint does Plaintiff allege that he did not have adequate

9    opportunity to litigate the disputed issues of fact which were resolved by the PSCSC order.  The

10   Court finds that the PSCSC was acting in a judicial capacity, that by its rulings it resolved

11   disputed issues of fact properly before it which the parties had an adequate opportunity to

12   litigate, and on that basis its findings of fact and conclusions of law are entitled to *res judicata*

13   effect.

14       However, the Court also notes that, while arguing that "Castello is therefore barred from

15   re-litigating the issues he raised in the PSCSC appeal process" (Motion, pp. 10-11), Defendants

16   do not cite to any specific causes of action which are eliminated as result of the collateral

17   estoppel effect of the PSCSC order.  Where Plaintiff is prohibited from disputing certain facts

18   and legal conclusions on the basis of the PSCSC action, the Court has so noted in this order.

19   First Amendment retaliation (*Complaint, Fourth and Fifth Claims for Relief, ¶¶ 8.1 – 9.4*)

20       While Plaintiff has established a *prima facie* case of retaliation on the basis of First

21   Amendment activity, his rights in this regard do not outweigh his government employer's

22   interests in the orderly and efficient functioning of their organization.

23

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 6

1    "In order to establish a prima facie case of retaliation under the First Amendment,

2    [Plaintiff] must show that (1) []he engaged in protected speech; (2) the defendants took an

3    "adverse employment action" against h[im]; and (3) h[is] speech was a "substantial or

4    motivating" factor for the adverse employment action." Thomas v. City of Beaverton, 379 F.3d

5    802, 808 (9th Cir. 2004) (citing Coszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir. 2003)

6    and Ulrich v. City & County of San Francisco, 308 F.3d 968, 976 (9th Cir. 2002). Under the

7    "protected speech" element, Plaintiff's speech is protected only if he spoke "as a citizen upon

8    matters of public concern" rather than "as an employee upon matters only of personal interest."

9    Roe v. City of San Diego, 356 F.3d 1108, 1112 (9th Cir. 2004); see Connick v. Myers, 461 U.S.

10    138, 147 (1983).  Even if Plaintiff succeeds in establishing a *prima facie* case, however, his

11    claim must still survive the balancing test enunciated in Pickering v. Board of Education, 391

12    U.S. 563 (1968).

13    *Public concern*

14    The issue of whether a public employee's exercise of First Amendment rights raises an

15    issue of public concern is a question of law which can be determined at summary judgment by

16    looking to the "content, form and context of a given statement."  Connick, 461 U.S. at 147-48, n.

17    7.  Issues of public concern can include a government agency failing to discharge its public

18    duties or disclosing actual or potential malfeasance or breaches of public trust.  Id.   The Ninth

19    Circuit has articulated the test as: does the speech "concern[] issues about which information is

20    needed or appropriate to enable members of society to make informed decisions about the

21    operation of their government"?  Coszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir. 2003).

22    Private disputes are not generally considered matters of public concern.  Id.

23

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 7

1    While the Court's previous order (on the motion to dismiss brought by former

2    defendants Simmons and Shea) found that "the emotional and psychological stability of an

3    emergency medical worker is 'an issue of public concern'" (Dkt. No. 28, p. 10), Plaintiff's

4    activities were not addressed to the paramedics' fitness for duty.  However, the Court also found

5    in its previous order that "the responsiveness of the SFD Fire Chief to the problems, concerns

6    and morale issues within his department" was also an issue of public concern.  Id. at 11.  This

7    issue of management responsiveness can fairly be said to be a focus of Plaintiff's survey and in

8    that regard the survey went beyond a matter of "private dispute" and can be characterized as

9    addressing "an issue of public concern."

10   *Adverse employment action/substantial or motivating factor*

11   Defendants do not challenge Plaintiff's assertion that the disciplinary consequences they

12   imposed on him constituted an "adverse employment action," nor that his circulation of the

13   petition (and refusal to desist from promoting it) was a motivating factor in their decision.  The

14   Court finds these two factors in Plaintiff's favor.

15   *Balancing the governmental interest*

16   Despite Plaintiff having established his *prima facie* First Amendment/retaliation claims,

17   Defendants are still entitled to summary judgment of dismissal on these claims by virtue of the

18   Pickering balancing test.  When a government employee raises a First Amendment claim, that

19   employee's interest as a citizen in commenting on matters of public concern must be balanced

20   against "the interest of the State, as an employer, in promoting the efficiency of the public

21   services that it performs through its employees."  Pickering, 391 U.S. at 568. Even if the

22   circulation of Plaintiff's survey is determined to be a matter of public concern, he must still

23   demonstrate that his right to this form of expressive conduct outweighed SFD's interest in the

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 8

1   "effective and efficient fulfillment of its responsibilities to the public." <u>Connick</u>, 461 U.S. at

2   150.  This is a balancing test based on the unique facts of each case (<u>Moran v. State of</u>

3   <u>Washington</u>, 147 F.3d 839, 845 (9th Cir. 1998)), keeping in mind that

> .. the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs.  This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch.

6   <u>Arnett v. Kennedy</u>, 416 U.S. 134, 168 (1974).

7       The Court finds that this factor weighs heavily in Defendants' favor.  SFD had already

8   had complaints about the circulation of the survey from personnel who believed it constituted

9   harassment.  (Plaintiff argues that two people complaining does not constitute "disruption" – Pltf

10   Response, p. 16 – but <u>Arnet</u> makes it clear that an employer need not delay where interference

11   with the efficient delivery of its services are concerned; it may act with "dispatch.")  Further

12   corroboration of the department's concern can be found in the fact that Plaintiff chose to go

13   outside accepted union protocols for addressing issues of this nature and embark on a personal

14   crusade to address the problems he perceived.  The potential for disruption from that course of

15   conduct lends further weight to SFD's interest in the "effective and efficient fulfillment of its

16   responsibilities to the public."  And, as the Supreme Court has held, "we have given substantial

17   weight to government employers' reasonable predictions of disruption, even when the speech

18   involved is on a matter of public concern."  <u>Waters v. Churchill</u>, 511 U.S. 661, 673 (1994).

19       Plaintiff attempts to frame the issue as whether "the city or SFD [would] seek to prevent

20   a private citizen from surveying the paramedics?"  Pltf Response, p. 15.  That argument misses

21   the point of "public employee First Amendment" analysis – the inquiry must look to whether the

22   government agency was justified, by reason of legitimate concerns regarding the proper

23   functioning of their unit, in disciplining an *employee* whose expressive conduct was judged

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 9

1   detrimental to the well-being of their personnel and the success of their operations.  The answer

2   to that inquiry, under the facts of this case, is "yes," and on that basis Defendants are entitled to

3   summary judgment dismissing Plaintiff's First Amendment retaliation claim.

4   *Duggins' defenses: Causal connection and qualified immunity*

5       Even if this Court were to find a First Amendment violation which was not outweighed

6   by a governmental interest, Duggins cannot be held individually liable because (1) there is no

7   causal connection between his conduct and Plaintiff's alleged constitutional violation and (2) in

8   any event he is entitled to qualified immunity.

9       Plaintiff's allegations require him to come forward with admissible material evidence of

10  either (1) Duggins' personal involvement in the alleged deprivation of Plaintiff's constitutional

11  rights or (2) a causal connection between Duggins' actions and the violation.  Hansen v. Black,

12  885 F.2d 642, 646 (9th Cir. 1989).  Plaintiff's complaint merely alleges that Duggins informed

13  him that Chief Dean wanted to discuss the SM1 survey with him.  Complaint, ¶ 4.3.  His failure

14  to present direct evidence (as opposed to speculation) that Duggins personally participated in the

15  unlawful denial of his First Amendment rights entitles Defendants to summary judgment on this

16  issue.[4]

17      Plaintiff attempts to avoid summary judgment on this issue by framing the question as

18  "whether it is objectively reasonable for [ ] Duggins to fail and/or refuse to transfer Castello back

19  to B-3…" and argues that "these are questions of fact for the jury." Pltf Response, p. 17.  It is not

20  a persuasive argument.  First, Plaintiff presents no evidence that Duggins had the power to

21  _____

22      [4] Plaintiff raises an additional constitutional argument for the first time; namely, that Defendants' actions
    constituted a deprivation without due process of his property interest in the salary and benefits of his position.  Pltf
23  Response, pp 16-17. This allegation appears nowhere in Plaintiff's complaint and has never before been raised in the
    history (now over a year old) of this litigation.  It is a violation of FRCP 8(a)(2) which requires that the complaint
    put the responding parties on notice of the claims against them.  At best it may function as a motion to amend
24  Plaintiff's complaint, which the Court rejects as untimely.

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 10

transfer him out of or back into B3 (while Defendants present evidence that only Chief Dean had that authority; *see* 2nd Decl. of Dean, ¶ 2).  Defendants would not be entitled to summary judgment on a mixed question of fact of law <u>if</u> there are disputed material facts.  <u>Taravella v. Wolcott</u>, 599 F.3d 129 (2nd Cir. 2010).  But Plaintiff has presented no factual disputes concerning what Defendant Duggins did; in the absence of such disputed facts, the Court finds that he is not, as a matter of law, entitled to maintain this claim.

Nor can Plaintiff overcome the legal conclusion that Duggins is entitled to qualified immunity.  A ruling on this issue requires a two-part inquiry: (1) do the undisputed facts establish a violation of a constitutional right and (2) did Defendant's actions violate a right which was "clearly established" at the time?  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  The Court has already ruled *supra* that, as a public employee, Plaintiff has not demonstrated that his First Amendment rights outweighed SFD's interest in preserving the proper and efficient delivery of its service.

The Court further finds that, even had Plaintiff succeeded in establishing the primacy of his First Amendment rights over SFD's interests, Duggins is still entitled to qualified immunity on the grounds that those rights were not so "clearly established" at the time of the actions in question that Duggins could be charged as a matter of law with the knowledge that he was violating them.  The test announced in the Ninth Circuit holds that, if an officer of reasonable competence could disagree on whether a chosen course of conduct is constitutional, "immunity should be recognized." <u>Brewster v. Board of Education</u>, 149 F.3d 971, 977 (9th Cir. 1988). That is the case on the facts before this Court – at the very least, reasonably competent officers could disagree on whether the discipline accorded Plaintiff was constitutional and on that basis Duggins is granted qualified immunity for any involvement he may have had in that action.

1    <u>Disparate treatment</u> *(Complaint, Third Claim for Relief, ¶ 7.3)*

2         Although it is not clear from Plaintiff's complaint whether he brings his gender

3 discrimination claim under federal or state law (or both), since Washington courts look to the

4 <u>McDonnell Douglas</u> burden-shifting test, the analysis is essentially identical.

5         Plaintiff's *prima facie* case of disparate treatment on the basis of gender requires a

6 showing that he received less favorable treatment in the terms and conditions of his employment

7 than similarly situated, non-protected employees, and that he and the non-protected employees

8 ("comparators") were doing substantially similar work.  <u>Domingo v. Boeing Employees' Credit</u>

9 <u>Union</u>, 124 Wn.App. 71, 81-83 (2004); <u>Moran v. Selig</u>, 447 F.3d 748, 753 (9th Cir. 2006).

10 Comparators must be "similarly situated in all respects."  <u>Mitchell v. Toledo Hospital</u>, 964 F.2d

11 577, 583 (6th Cir. 1992).

12         Plaintiff's proof consists of three examples of situations which he considers similar to his

13 own:

14    1.  The incident with a female paramedic (Simmons) and the SFD Medical Officer (Dr. Copass) involving a heated exchange using profanity which resulted in no charges.  Pltf. Ex. 13

16    2.  An incident involving a female firefighter (Pfeiffer) and a lieutenant in her battalion in which Pfeiffer was charged with using profanity directed at a superior officer; Pfeiffer received a one-shift suspension. Pltf. Ex. 14.

17    3.  An incident involving a dispatcher (Radosevich) who punched a locker and engaged in "an angry monologue" described as "accusatory and threatening" towards another member of the department.  Radosevich received Official Reprimands for "Improper Performance of Duties" (she left her post without authorization) and "Damage to Department Property."  Pltf. Ex. 15.

20         Plaintiff appears to assert that because his three examples are female, employed by SFD

21 and engaged in cursing, they qualify as comparators.  This is not the state of the law.

22         [T]o be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must *have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's*

1   *treatment of them for it.* Mazzella v. RCA Global Communications, Inc., 642 F.Supp.
2   1531 (S.D.N.Y. 1986), *aff'd*, 814 F.2d 653 (2d Cir. 1987); Lanear v. Safeway Grocery,
    843 F.2d 298 (8th Cir. 1988)…; Cox v. Electronic Data Systems Corp., 751 F.Supp. 680
3   (E.D.Mich.1990).

4   Mitchell v. Toledo Hosp.  964 F.2d 577, 583 (6th Cir. 1992) (emphasis supplied).

5        Neither Pfeiffer nor Radosevich are paramedics.  Pfeiffer's incident occurred during an

6   emergency response and there is no report that the superior officer at whom the profanity was

7   directed felt threatened.  *See* Ex. 14.  Radosevich was a dispatcher and walked away from her

8   post in a fit of anger; the report does describe her speech as "threatening," but nothing in the

9   written description of the incident indicates that her behavior was physically threatening.  *See*

10  Ex. 15.  Neither of the incidents regarding Simmons nor Radosevich involved officers in their

11  chain of command, and in Simmons' case the officer involved took responsibility for his part in

12  the altercation and described it as a "misunderstanding."  Ex. 13, p. 2.[5]  In none of the reports

13  cited by Plaintiff was the offending party's behavior described as "unacceptable, totally

14  inappropriate, insubordinate" and deserving of "severe action" (as Plaintiff's behavior was

15  characterized).  Ex. O, ¶ 68.  It cannot be said as a matter of law that Plaintiff's comparators are

16  "similarly-situated" and his disparate treatment claim fails on that basis.

17  Disparate impact *(Complaint, Third Claim for Relief, ¶ 7.3)*

18        Not only has Plaintiff failed to identify a facially neutral policy that falls more harshly on

19  a protected group (Pottenger v. Potlatch Corp., 329F.3d 740, 749 (9th Cir. 2003)), but he failed

20  to respond to Defendants' arguments in favor of summary judgment on this claim.  Where "a

21  party fails to file papers in opposition to a motion, such failure may be considered by the Court

22  as an admission that the motion has merit."  Local Rule CR 7(b)(2).

23  _____

24  [5] Furthermore, the PSCSC ruled the Simmons-Copas incident "not comparable" to Plaintiff's
    circumstances, a decision which (as discussed *supra*) is entitled to preclusive effect.  Dean Decl., Ex. O, ¶ 65.

Negligent supervision *(Complaint, First and Sixth Claims for Relief, ¶¶ 5.3, 10.2-10.5)*

Again, Plaintiff fails to respond to this portion of Defendants' summary judgment motion, permitting the Court to invoke the presumption of LR 7(b)(2).  In the interests of thoroughness, the Court notes that legal analysis of the claims confirms that they cannot be sustained.

Plaintiff alleges that, as a result of Chief Dean's negligent supervision, the SFD's firefighters are inadequately trained "in the implementation and enforcement of the Seattle Fire Department's anti-harassment, non-retaliation and workplace violence prevention policies." Complaint, ¶ 5.3.  The Court has previously found that there is no claim for harassment in the state of Washington, and on that basis dismissed Plaintiff's harassment claim against former Defendants Shea and Simmons.  Dkt. No. 28, Order, p. 21.  Plaintiff's retaliation claim is likewise subject to dismissal as a matter of law (as explained *supra*), and he makes no allegations that he was subjected to "workplace violence."  As a matter of law, Plaintiff has no negligent supervision cause of action against Defendant Dean.

In his Sixth Claim for Relief, Plaintiff alleges that Dean and Duggins' negligent supervision of former Defendants Shea and Simmons "condoned, permitted and facilitated the harassment of Plaintiff."  Complaint, ¶ 10.4.  Based on the Court's finding that no cause of action for harassment exists (as well as the dismissal of the claims against Shea and Simmons), this claim is unsustainable as a matter of law.

Defendants are entitled to summary judgment of dismissal regarding Plaintiff's claims of relief on the grounds of negligent supervision.

1   Defamation *(Complaint, Seventh Claim for Relief, ¶¶ 11.1-11.7)*

2      Plaintiff alleges that statements by Simmons, Shea and Duggins were defamatory.  The

3   portion of Plaintiff's defamation claim concerning former Defendants Shea and Simmons has

4   already been dismissed, leaving Defendant Duggins' reading and distribution of the Hepburn

5   memo at the paramedics' meeting as the sole basis for this cause of action.  Plaintiff fails to

6   produce either the facts or the law on any of the elements required to sustain this cause of action.

7      To establish defamation, Plaintiff must demonstrate (1) falsity, (2) an unprivileged

8   communication, (3) fault, and (4) damages.  Mohr v. Grant, 153 Wn.2d 812, 822 (2005).

9      Proof of falsity requires that Plaintiff identify "the precise statements alleged to be

10   defamatory, who made them and where."  Flowers v. Carville, 310 F.3d 1118, 1130 (9th Cir.

11   2002).  Plaintiff's complaint fails to identify with any precision which statements he alleges to be

12   false and/or defamatory.  The only statements attributed to Defendant Duggins in the complaint

13   were made "to paramedics on September 1, 2009" (Complaint ¶ 11.3); i.e., at the paramedic

14   meeting where the Hepburn memo was read.  When questioned about those at his deposition,

15   Plaintiff admitted that nothing in the memo was untrue ("… well, I guess it's not false, it's just

16   not legal where it says that paramedic in any capacity with Seattle Fire Department or any other

17   department or agency, the, there's no legal right to impose that upon me.  So I guess I took that

18   as a false statement."  Wollett Decl., Ex. A, 244:12-17A).  Without proof of falsity, there is no

19   defamation claim.

20      The Court also finds that Duggins' statements are protected under the qualified privilege

21   which applies to statements between persons sharing a common interest in the "subject matter of

22   the communication."  Moe v. Wise, 97 Wn.App. 950, 957 (1999).  Duggins shared the contents

23   of the memo to insure that the paramedics did not place themselves or the department in a

24

1   dangerous or inappropriate situation by looking to Plaintiff (who would still be serving alongside

2   them as a firefighter) to perform paramedic duties during his suspension from the medic

3   program.  Once a *prima facie* case for a qualified privilege is made, the burden shifts to Plaintiff

4   to establish by clear and convincing evidence that the privilege was abused.  <u>Valdez-Zontek v.</u>

5   <u>Eastmont School District</u>, 154 Wn.App. 147, 162 (2010).  Plaintiff offers no such evidence and

6   the communication stands as privileged (notwithstanding Duggins' personal conclusion that it

7   was "inappropriate").

8          Finally, on the issue of fault, Plaintiff has previously been found to be a public official

9   (*see* Dkt. No. 28, Order, p. 18: "[Plaintiff's] conduct was that of a public official because it

10   involved the manner in which he performed… duties pursuant to a public contract"), thus he

11   must prove by clear and convincing evidence that the statements he alleges to defamatory were

12   made with actual malice.  <u>Corbally v. Kennewick School District</u>, 94 Wn.App. 736, 741 (1999).

13   Surprisingly, Plaintiff ignores this ruling and instead takes the position that he is <u>not</u> a public

14   official, but "a mere public figure" who need not prove actual malice.  Pltf Response, p. 18.  As

15   the Court has already ruled, he is incorrect.  Defendants are entitled to summary judgment of

16   dismissal of Plaintiff's defamation claims.

17   <u>False light *(Complaint, Seventh Claim for Relief, ¶¶ 11.1-11.7)*</u>

18          Plaintiff's false light claims fare no better than his defamation allegations.  "False light"

19   liability exists where "someone publicizes a matter that places another in a false light if (a) the

20   false light would be highly offensive to a reasonable person and (b) the actor knew of or

21   recklessly disregarded the falsity of the publication and the false light in which the other would

22   be placed."  <u>Eastwood v. Cascade Broad. Co.</u>, 106 Wn.2d 466, 470-71 (1986).

23

24

1    The "falsity of the publication" element fails under the same analysis as in the

2  "defamation" section *supra*, leaving Plaintiff to rely on the issue of "the false light in which the

3  other would be placed."  A claim of falsity may not be based on the negative implication of true

4  statements and defamatory meaning may not be imputed to true statements.  Lee v. Columbian,

5  Inc., 64 Wn.App. 534, 538 (1991).  Plaintiff identifies the "false light" as arising from the

6  reading of the Hepburn memo to the other paramedics, "with no explanation… [leaving] this

7  huge void which people fill in on their own.  And so people assume that because this is

8  unheralded that I did something really bad, and that maybe all this nonsense that Ms. Simmons

9  and Shea had been putting out had some validity to it."  Wollett Decl., Ex. A, 245:1-8.  But in the

10  absence of a single false statement (and thus any grounds for establishing that Defendant

11  Duggins knew or should have known that the statements in the Hepburn memo were inaccurate),

12  the law will  not presume that negative implications arising from true statements are actionable

13  on "false light" grounds.  Plaintiff's "false light" claim will not stand on the basis of Duggins'

14  reading of the Hepburn memo.

15    Plaintiff attempts in his reply briefing to add a further factual basis to his false

16  light/defamation claims; namely, his temporary transfer out of B3 in the wake of the

17  insubordination determination related to the SM1 survey.  Pltf Response, pp. 18-19.  Again, he

18  fails to identify any specific statements which were false, or any statements at all – it is the

19  action of transferring him that he appears to rely on as casting the "false light."   But more

20  relevantly he introduces allegations which are nowhere apparent from his complaint.  As with his

21  new "due process" theory, the Court will deem this new allegation an untimely motion to amend

22  his complaint which will be denied.

23

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 17

1    Finally, both Plaintiff's false light and defamation claims are completely lacking in proof

2    of damages.  He speculates at length on the terrible things that his co-workers must have thought

3    about him as a result of the complained-of actions, but he fails to present proof of a single co-

4    worker who *actually* had a negative impression of him based on the actions, or of a single harm

5    which befell him as a result of the false light he alleges was shed on him.

6    Right of privacy *(Complaint, Tenth Claim for Relief, ¶¶ 14.1-14.4)*

7    The Court finds that the information disclosed in the allegations of Plaintiff's complaint

8    does not satisfy the legal definition of those matters accorded the protection of the law under this

9    legal theory.  The tort of violation of right to privacy arises only where a plaintiff can

10    demonstrate that the offending party gave "publicity to a matter concerning the private life of

11    another."  Hearst Corp. v. Hoppe, 90 Wn.2nd 123, 135 (1978).  The Washington Supreme Court

12    has described the area generally as "facts about himself that he does not expose to the public eye

13    but keeps entirely to himself or at most reveals only to his family or to close personal friends."

14    Reid v. Pierce County, 136 Wn.2d 195, 205-06.  Examples include sexual relations, family

15    disputes, "disgraceful or humiliating" illnesses, intimate personal letters, details of home life and

16    "some of his past history he would rather forget."  Id.

17    Details of "misconduct in the course of the job performance of a public official or

18    employee" are not considered matters of personal privacy at law.  Corey v. Pierce County, 154

19    Wn.App. 752, 766 (2010).  In the instance of which Plaintiff complains (again, the reading of the

20    Hepburn memo), it was not even the "details of the misconduct" which were made public; it was

21    the disciplinary actions which resulted from the misconduct.  Plaintiff fails completely to

22    demonstrate how these facts fall within a legally-accepted definition of his "private life."

23

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 18

1    Plaintiff's claim fares no better on the remaining elements of this tort: that the disclosure

2    would be highly offensive to a reasonable person and is not of legitimate concern to the public.

3    Hearst Corp., 90 Wn.2d at 135.  Facts relating to official assessments of job performance or

4    discipline are not, as a matter of law, deemed "offensive to a reasonable person." Cowles Pub.

5    Co. v. State Patrol, 44 Wn.App. 882, 892-93 (1986) ("Although the officers may be embarrassed

6    by the release of their names in conjunction with the information in these files, the disclosure of

7    the details of an officer's misconduct, while in the performance of his public duties, is not highly

8    offensive.").

9    On the issue of legitimate public concern, the Court has already ruled that the

10   psychological and emotional stability of an emergency medical worker is "an issue of public

11   concern." Dkt. No. 28, Order, p. 10.  Furthermore, there is case law that "the public has a

12   legitimate concern in" the response of governmental agencies to allegations of misconduct by

13   their employees.  Bainbridge Isl. Police Guild v. City of Puyallup, 172 Wn.2d 398, 416 (2011).

14   Plaintiff makes no response to Defendants' arguments in this regard, further substantiating their

15   merit.  Defendants' request for summary judgment of dismissal of Plaintiff's claim of "invasion

16   of privacy" is granted.

17   Once again, Plaintiff introduces new factual material not contained in his complaint to

18   substantiate his privacy claim – the transmission by EEO investigation counsel Taylor to co-

19   worker Simmons of unpublished investigative facts.  Pltf Response, p. 19; Luhn Decl., Ex. 9.

20   The Court will not subject this previously unalleged material to summary judgment analysis – it

21   will be rejected as another untimely motion to amend Plaintiff's complaint.

22

23

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 19

<u>Tortious interference with business expectancy</u> *(Complaint, Eighth Claim for Relief, ¶¶ 12.1-12.8)*

The elements of this tort are:

1.  A valid contractual relationship or business expectancy
2.  Interferor's knowledge of the relationship or expectancy
3.  Intentional interference, inducing a breach or termination
4.  Motivated by an improper purpose or using improper means
5.  Damage as a result of the interference
    <u>Sintra v. City of Seattle</u>, 119 Wn.2d 1, 28 (1992).

Plaintiff alleges two business expectancies: (1) "with his coworkers and Seattle Fire Department personnel generally to work in an atmosphere of trust and mutual respect" (Complaint, ¶ 12.2) and (2) "with the City of Bainbridge Island and other third party employers of paramedics."  Complaint, ¶ 12.3.

Plaintiff does not respond to Defendants' argument that this tort requires a "meddling third party."   Someone who is a party to the relationship (in this case, Plaintiff's relationship with his "coworkers and SFD personnel generally") cannot be held separately liable (beyond the obvious contractual remedies) for interference with a business expectancy.  <u>Houser v. City of Redmond</u>, 91 Wn.2d 36, 39 (1978).  Further, Plaintiff provides no legal authority for the implied argument that "business expectancy" is defined as "how I expect to be treated at my place of business."

Plaintiff's reference to the Bainbridge Island contract (*see* Dean Decl., ¶ 17) runs afoul of the fourth element of this tort.  There is no question that Plaintiff's suspension from paramedic duties resulted in his inability to operate in a similar capacity with Bainbridge Island pursuant to SFD's contract with that municipality.  But Plaintiff has the burden to establish that the interference was the result of Defendants' improper motive or improper means.  Interference can be wrongful by virtue of violating a statute or regulation, violating common law, or violating an

1    established standard of the trade or profession.  Pleas v. City of Seattle, 112 Wn.2d 794, 804

2    (1989).  But interference may be deemed "privileged" by virtue of the character of the

3    expectancy, the relationship between the various parties, the interest which the interferor seeks to

4    advance and the social desirability of protecting the interferor's freedom of action.  Calbom v.

5    Knudtzon, 65 Wn.2d 157, 163 (1964).

6           Here, SFD had a contract to provide paramedics to the City of Bainbridge Island.  Dean

7    Decl., ¶ 17.  Plaintiff does not controvert Defendants' assertion that they thought it inadvisable

8    to provide to the City of Bainbridge Island the services of a paramedic whom they deemed not

9    suited for service within their own ranks.  On this basis, Defendants had a proper motive as a

10   matter of law for interfering with Plaintiff's "business expectancy" vis-à-vis the City of

11   Bainbridge.

12          Nor is there any support for Plaintiff's speculative assertion  of his "belief" that

13   Defendants Dean or Duggins pressured Dr. Copass not to permit him to work on Bainbridge

14   Island.  Pltf Response, p. 20.  The evidence cited for this allegation (2nd Luhn Decl., Castello

15   Dep., pp. 260-63) says only that a co-worker told Plaintiff that Copass said Plaintiff was not to

16   work on Bainbridge for the duration of his suspension, not that Duggins or Dean told him to

17   exclude Plaintiff.  As for the "other contracts" to which Plaintiff refers, other than his deposition

18   testimony he offers no proof of the existence of any contracts or offers of employment.

19   Plaintiff's hearsay testimony regarding the existence of the foundational facts of his claim is

20   insufficient to carry his burden of coming forth with evidence demonstrating the existence of a

21   genuine issue for trial.

22          Defendants are entitled to dismissal of the tortious interference claim as a matter of law.

23

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 21

1 | <u>Willful withholding of wages (Ninth Claim for Relief):</u> *Unaccounted-for cause of action*

2       Defendants' summary judgment motion addresses all of Plaintiff's claims except his

3 Ninth Claim for Relief (Complaint, ¶¶ 13.1-13.5).  In that cause of action, Plaintiff alleges that,

4 of the required 50 hours of annual Continuing Medical Education, 42 hours are paid for at the

5 paramedic's overtime rate and that he satisfied all requirements to receive those 42 hours' worth

6 of wages in 2008-2009 and 2009-2010.  The claim alleges that the City and/or the SFD "willfully

7 withheld" those wages.

8       Defendants' motion does not address this claim.  The Court will not speculate on the

9 effect of the grant of summary judgment on the remaining claims upon this cause of action.

10 Defendants will be ordered to submit a brief outlining the status of the Ninth Claim (to which

11 Plaintiff will be permitted to respond) so that the Court can ascertain whether any claims remain

12 for trial in this litigation.

13 **Conclusion**

14       The Court finds that there are no disputed issues of material fact and that Defendants are

15 entitled to summary judgment on all claims except Plaintiff's Ninth Claim for Relief.

16       Regarding Plaintiff's Ninth Claim for Relief, Defendants are ordered to file with the

17 Court a brief (not to exceed 3 pages) on the status of that claim.  The brief shall be filed by

18 December 5, 2011.  Plaintiff's response (not to exceed 3 pages) will be due December 9, 2011

19 and the Court will render its further decision forthwith.

20       The clerk is ordered to provide copies of this order to all counsel.

21       Dated:  November 30, 2011.

22

23                   _____

                     Marsha J. Pechman

24                      United States District Judge